Merrimack
No. 7435

KEARSARGE COMPUTER, INC.

v.

ACME STAPLE COMPANY, INC.

November 30, 1976

*McSwiney, Jones & Semple* and *Robert E. Bowers, Jr. (Mr. Bowers* orally) for the plaintiff.

*Orr & Reno* and *Richard B. Couser (Mr. Couser* orally) for the defendant.

KENISON, C.J.  This appeal results from cross actions by Kearsarge Computer, Inc., against Acme Staple Company, Inc., and by Acme against Kearsarge. Both actions relate to a certain data processing contract between the parties. Kearsarge sought payment for goods and services sold and delivered and damages for breach of contract. Acme also sued for breach of contract and alleged that, following termination of the contract, Kearsarge retained certain property owned by Acme. The cases were consolidated for a hearing on the merits before Master *Earl J. Dearborn,* Esquire, who held in favor of Kearsarge on all ultimate issues in both cases and awarded Kearsarge $12,313.22, plus interest and costs. *Loughlin,* J., approved the master's report and reserved and transferred the defendant's exceptions.

Under a one-year contract which began June 11, 1971, Kearsarge performed electronic data processing services for Acme for twenty-five dollars per computer hour or $2,000 per month whichever was greater. At a Janaury 7, 1972 meeting between the parties, Acme terminated the contract on the grounds that Kearsarge's performance was unsatisfactory. In a letter dated January 10, 1972, Kearsarge requested information regarding the alleged data processing errors and any losses therefrom. Acme responded that such information had been sufficiently provided at the meeting. On April 12, 1972, Kearsarge served pretrial discovery interrogatories upon Acme one of which read:

> "Please state in precise detail the alleged breaches by Kearsarge of the contract between it and Acme dated April 5, 1971, which resulted in Acme's alleged termination of said contract on January 7, 1972, giving the date of each alleged breach."

In response, Acme listed eleven incidents of alleged breach in the degree of detail requested.

At trial the master refused to permit Acme to introduce evidence of any breaches other than those listed in the answer to the interrogatory. He also did not allow Mr. Moffitt, who answered the question, to testify as to his understanding of the question. The first issue in this case is whether the master erred in exclud-

ing Acme's evidence.

Ordinarily, answers to interrogatories do not limit the answering party's proof at trial. *McElroy v. United Airlines, Inc.,* 21 F.R.D. 100, 102 (W.D. Mo. 1957); 4A J. Moore, Federal Practice § 33.29 [2] (2d ed. 1975); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2181, at 577-78 (1970) *citing* Advisory Committee Note to Rule 33(b). However, the purpose of interrogatories is to narrow the issues of the litigation, *Sawyer v. Boufford,* 113 N.H. 627, 312 A.2d 693 (1973); *Hartford Accident & Co. v. Cutter,* 108 N.H. 112, 229 A.2d 173 (1967); F. James, Civil Procedure § 6.4, at 190 (1965), and prevent unfair surprise by making evidence available in time for both parties to evaluate it and adequately prepare for trial. *McDuffey v. Boston & Maine R.R.,* 102 N.H. 179, 152 A.2d 606 (1959). In order to achieve these goals, a party must fully disclose all requested information which he has at the time of the demand. *McElroy v. United Airlines, Inc., supra; see Farnum v. Bristol-Myers Co.,* 107 N.H. 165, 219 A.2d 277 (1966). Although the duty to investigate is not unlimited, a party must find out what is in his own records and what is within the knowledge of his agents and employees concerning the occurrence or transaction. F. James *supra.*

It is not clear from the record exactly what additional breaches Acme wished to introduce into evidence nor why Mr. Moffitt did not include them in the answer to the interrogatory. The problem seems to be that, at the time of the service of the interrogatory, Acme did not have readily accessible and precise records of all of Kearsarge's errors, omissions and breaches and that, because of the high rate of error, all data had to be checked for accuracy. If the time for answering was too short, Acme could have requested an extension. Superior Court Rule 33; RSA 491: App. R. 33 (Supp. 1975). If the interrogatory was unclear or called for unduly burdensome research, Acme could have objected. *Id.* In any event every indication is that at the time of the answer the information relating to the additional breaches was within Acme's records or the knowledge of its employees. By failing to include all examples of breach, Acme did not answer the interrogatories with the completeness required by rule 33.

Even if the answer was sufficiently complete at the time it was made, subjecting Kearsarge to the surprise of undisclosed evidence so late in the trial would be contrary to the purpose of pretrial discovery. Under some circumstances, a party has a

continuing duty to supplement its answer to an interrogatory, especially when failure to disclose newly discovered information would substantially prejudice the other party. Fed. R. Civ. P. 26(e); 4 J. Moore, Federal Practice § 26.81 (2d ed. 1976); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2048-50 (1970); Grauman, *Deposition and Discovery,* 47 Ky. L.J. 175, 180-84 (1959); *Developments in the Law – Discovery,* 74 Harv. L. Rev. 940, 961-65 (1961). Although superior court rule 33 does not explicitly require supplementation of responses, the duty to update is implicit in the requirement of full disclosure. Over two years passed between the return of the answer and the trial. Acme could have informed Kearsarge that it planned to allege additional breaches at trial. Under all the circumstances, the master did not err in excluding the evidence.

The second issue is whether the master erred in awarding Kearsarge the full balance of the contract price. If the defendant's breach saves expense to the plaintiff, the plaintiff will recover the contract price minus the savings. *McLaughlin v. Union Leader,* 99 N.H. 492, 500, 116 A.2d 489, 496 (1955); Restatement of Contracts § 335 (1932); 5 A. Corbin, Contracts § 1038 (1964). The parties agree that if termination of the contract caused no savings or pecuniary advantage to Kearsarge, recovery is the full contract price.

Acme contends that Kearsarge did experience certain savings and that the master erred in not reducing the damages accordingly. However, Acme's breach did not result in substantial savings to Kearsarge. The plaintiff would not have spent significantly more on salaries, machine rental, or other overhead expenses if it continued to provide Acme with data processing services. With respect to labor costs, if a plaintiff cannot reduce his work force because of the breach, no savings result. 5 A. Corbin, *supra* at § 1038, at 239-40. Extensive testimony makes clear that no layoffs were possible in this case because each of Kearsarge's three employees performed separate functions. The payroll decrease subsequent to Acme's termination occurred only because the employees voluntarily accepted a drastic reduction in wages so that Kearsarge could stay in business. Such survival tactics cannot properly be classified as savings. Kearsarge's operating costs — notably the rentals on computers and other equipment — were substantially fixed. The reduction of output due to the breach did

not result in savings. *Id.;* R. Posner, Economic Analysis of the Law 59 n.7 (1972).

At the time of the breach, the only performance left on Kearsarge's part was the actual running of the data processing equipment and the delivery of the results to Acme. The cost of performance was the cost of paper, electricity and transportation of data to and from the offices of the parties. In suits for breach of contracts to sell advertising, courts hold that the costs of ink, paper and typographical composition are negligible and allow plaintiffs to recover the full contract price. Cases cited in Annot., 17 A.L.R.2d 968, 973 (1951). Similarly, the costs of performance were trivial in relation to the contract price. Because the breach did not relieve Kearsarge of a costly burden, the master did not err in awarding Kearsarge the full contract price. Restatement, *supra* at § 335, Comment *b*; 5 A. Corbin, *supra* at § 1038.

The fact that the plaintiff did not introduce evidence of the cost of paper, electricity and delivery of data does not bar recovery because the defendant has the burden of proving savings. Restatement, *supra* at § 335, Ill. 5. The general rule is: If the plaintiff's required expenditures are of cash or material, the tendency is to put the burden of allegation and proof of the amount thereof on him, but if his expenditures would be of time or labor, the burden is normally placed on the defendant. The court usually decides whether the plaintiff's performance requires an outlay of money or material from the nature of the contract, without a specific raising of the point by the parties. Annot., 17 A.L.R.2d 968, 972 (1951). It is clear from the facts of this case that Kearsarge's performance did not require substantial cash outlays or materials as in the cases upon which the defendant relies.

After Acme terminated the contract, Kearsarge increased its efforts to secure new business. Acme's position is that at least some of the income from the new business should mitigate the damages. The general rule is that "[g]ains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, unless such gains could not have been made, had there been no breach." 5 A. Corbin, *supra* at § 1041; *see* D. Dobbs, Remedies § 3.6, at 183-84, § 12.6 at 827 (1973). In a suit for breach of a personal services contract, the wages obtained by the plaintiff-employee from a substitute job are deducted from the amount of damages if the earn-

ings of the second income would not have been possible but for the breach. *Id.;* 11 Williston, Contracts § 1358 (3d ed. W. Jaeger 1968); Annot., 15 A.L.R. 751 (1921). In contrast, no deduction is allowed if the plaintiff sells to a third party a product that can be produced according to demand. The theory is that the second sale would have occurred even if the defendant did not breach his contract. *See Locks v. Wade,* 36 N.J. Super. 128, 114 A.2d 875 (App. Div. 1955); J. Calamari & J. Perillo, Contracts § 217 (1970); 5 A. Corbin, *supra* at § 1041.

A contract for computer data processing services is neither a contract purely for personal services nor a contract for the sale of goods. It is an enterprise that involves a combination of personal skills and labor, materials, equipment and time. In these respects, a contract for data processing services is similar to a construction contract or a contract for the sale of advertising layouts. The law with respect to these contracts is clear. When a party refuses to allow a builder to perform, the builder's profits on contracts entered into after the breach do not mitigate the damages unless the first contract required the builder's personal services to such an extent that concurrent performance of another contract would be impossible. *Olds v. Mapes-Reeves Const. Co.,* 117 Mass. 41, 58 N.E. 478 (1900); *Sides v. Contemporary Homes, Inc.,* 311 S.W.2d 117 (Mo. App. 1958); Restatement of Contracts § 346, Comment *f* on subsection (2) (1932); J. Calamari & J. Perillo, *supra* at § 217; Annot., 15 A.L.R. 751, 761 (1921). Likewise, when a purchaser of advertising space breaches his contract, the advertiser who is not limited by a specific number of pages recovers the full contract price. D. Dobbs, *supra* at § 3.6, at 183 n.2; Annot., 17 A.L.R.2d 968, 973 (1951). The reason is that, like manufacturing, these businesses are deemed to be expandable. The law presumes that they can accept a virtually unlimited amount of business so that income generated from accounts acquired after the breach does not mitigate the plaintiff's damages. 5 A. Corbin, Contracts § 1041 (1964). We hold that in the absence of evidence to the contrary a data processing contract does not involve unique personal services to such an extent that when the provider of such services seeks a new business after a breach of contract, the income from such new business mitigates the damages owed to him by the breaching party. There is no evidence that Kearsarge could not render service to its new clients but for Acme's breach.

Finally, although the master found that Kearsarge's errors may

have been justifiable, the contract unequivocally states that Kearsarge would be liable for its errors. Acme expended at least $837.75 in correcting mistakes in Kearsarge's work. Under the contract, Acme was entitled to this amount. Thus, Kearsarge's damages in the sum of $12,313.22 plus interest and costs shall be reduced by $837.75.

*So ordered.*

BOIS, J., did not sit; the others concurred.