[Nos. A124077, A124095, A125311. First Dist., Div. Five. Mar. 3, 2011.]

CELLPHONE TERMINATION FEE CASES.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.D. and E.

300

## COUNSEL

Bramson, Plutzik, Mahler & Birkhaeuser, Alan R. Plutzik, L. Timothy Fisher; Positive Legal Group, Jacqueline E. Mottek; Franklin & Franklin, J. David Franklin; and Scott A. Bursor for Plaintiffs and Appellants.

Quinn Emanuel Urquhart Oliver & Hedges, Dominic Surprenant, A. Brooks Gresham and Daniel H. Bromberg for Defendant and Appellant.

## OPINION

**BRUINIERS, J.**—These consolidated appeals are from a judgment after trial in a consumer class action against wireless telephone carrier Sprint Spectrum, L.P. (Sprint), challenging its policy of charging early termination fees (ETF's) to customers terminating service prior to expiration of defined contract periods.[1] The trial court found the ETF's to be unlawful penalties under Civil Code section 1671, subdivision (d),[2] enjoined enforcement, and granted restitution/damages to the plaintiff class in the amount of ETF's collected by Sprint during the class period, $73,775,975. A jury found that class members who had been charged ETF's had violated the terms of their contracts with Sprint, and that Sprint's actual damages exceeded the ETF charges Sprint had collected. The resulting setoff negated any monetary recovery to the class. The trial court, reasoning that the jury had failed to follow its instructions on Sprint's actual damages, granted the plaintiffs'[3] motion for a partial new trial on that issue.

Sprint appeals the decision invalidating the ETF's and enjoining their enforcement, and the court's grant of the motion for partial new trial on damages. Plaintiffs cross-appeal, alleging that the trial court erred in permitting Sprint to assert damage claims as setoffs to class claims for recovery of ETF's paid. In the published portions of this opinion we address the issues of federal preemption and the application of section 1671, subdivision (d). We affirm in all respects.

## I. BACKGROUND

### Procedural History

Sprint is a national cellular service carrier, providing cellular telephone service in California. In 2003, lawsuits were filed in Alameda County and in Orange County against Sprint and other cellular service providers[4] alleging that the ETF's violated California consumer protection laws and constituted

---

[1] This is one of several coordinated cases against wireless telephone carriers presenting similar issues.

[2] All further code references are to the Civil Code, unless otherwise indicated.

[3] The named plaintiffs, and class representatives, are Ramzy Ayyad, Jeweldean Hull, Christine Morton, Richard Samko, and Amanda Selby (hereafter Plaintiffs).

[4] The coordination proceeding included complaints against Nextel Communications, Inc. (Nextel). Sprint and Nextel merged to form Sprint/Nextel on August 12, 2005. On November 7, 2007, the trial court granted summary judgment in favor of Nextel on the Plaintiffs' premerger ETF claims.

unauthorized penalties under section 1671.[5] These actions and others were coordinated under Judicial Council order (Code Civ. Proc., § 404.3; Cal. Rules of Court, rule 3.524) before Judge Ronald Sabraw in the Alameda County Superior Court as *Cellphone Termination Fee Cases* (JCCP No. 4332). (See *Gatton, supra*, 152 Cal.App.4th at p. 575, fn. 1.)

On June 9, 2006, Judge Ronald Sabraw, the then designated coordination judge, certified a class in the related cases defined as: " 'All persons who (1) had a wireless telephone personal account with [Sprint] with a California area code and a California billing address[] who (2) cancelled the account at any time from July 23, 1999, through [March 18, 2007], and (3) were charged an early termination fee in connection with that cancellation.' "[6] The class certification was "expressly predicated" on an "aggregate approach to monetary relief and the related setoff and cross-claim issues." Thus, if the ETF's were found to be illegal and unenforceable, the wireless carriers would still potentially be entitled to offset against any class recovery for their actual damages in the form of lost profits.[7]

Pursuant to case management orders in the coordination proceedings, the ETF claims against Sprint were separately pled in a consolidated amended complaint. Plaintiffs alleged that, among other things, Sprint's ETF's violated section 1671, subdivision (d) because they were "penalties," which generated "substantial revenues and profits" and were intended "to prevent consumers from readily changing wireless telephone carriers."[8] The court granted Sprint

---

[5] In addition to the ETF claims, plaintiffs alleged other unfair business practices by the named defendants, including handset locking policies and deposit requirements. (*Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 575, fn. 1 [61 Cal.Rptr.3d 344] (*Gatton*).) The trial court divided the coordinated proceedings into these three substantive topics. (*Ibid.*)

[6] Judge Ronald Sabraw initially declined to certify a class consisting of current subscribers. That portion of his order was reversed by this court. (*In re Cellphone Termination Fee Cases* (June 9, 2008, A115457) [nonpub. opn.].)

[7] In a December 27, 2006 pretrial order, Judge Ronald Sabraw described the trial procedure in relevant part as follows: "The Court will permit Plaintiffs to present aggregate damage calculations for the claims of the entire class and will require the trier of fact to state the damages owed to the members of the Plaintiff class in the aggregate. The Court will also permit Defendants to present aggregate damage calculations for their cross-claims against the entire class and will require the trier of fact to state the damages that the members of the Plaintiff class might owe to Defendants. The Court will then set off the two numbers. If the net amount owed is a positive for Plaintiffs, then the Court will enter judgment in favor of the Plaintiff class for that amount. If the net amount owed is zero or a negative for the Plaintiffs, then the Court will enter judgment of zero in favor of the Plaintiff class. Defendants will not be permitted to recover money from the Plaintiff/Cross-Defendant class." (Fn. omitted.)

[8] The third consolidated amended complaint alleged six causes of action. Plaintiffs also pled violations of California's Consumers Legal Remedies Act (CLRA) (§ 1750 et seq.), the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and claims for unjust enrichment, and for money had and received.

leave to file a cross-complaint seeking monetary damages and equitable relief against class members for breach of contract in the event the ETF's were found to be unenforceable penalties. The court denied Plaintiffs' request to certify a cross-defendant consumer class on the basis that only setoff, and not affirmative relief, would be available if Sprint prevailed on its cross-complaint.[9]

By orders of December 10, 2007, and April 4, 2008, this case was severed and remanded for trial before Judge Bonnie Sabraw. In a March 17, 2008 pretrial order, the court considered which issues would be tried by the court and which by the jury. The court declined to bifurcate the case into separate court and jury trials, but identified the allocation of issues as follows: "First, the Court must decide whether ETFs are 'rates' under the Federal Communications Act ('FCA'), 47 U.S.C. [§] 332(c)(3)(A). . . . [¶] Second, the Court must decide whether the ETFs are an alternative means of performance rather than a liquidated damage clause under the terms of the contracts at issue. . . . [¶] Third, the Court must decide whether the ETFs of . . . [Sprint] are liquidated damage provisions under [section] 1671, and, if so, then whether they are lawful. . . . [¶] Finally, if the ETFs are unlawful, then a jury will determine the amount of damages under [section] 1671[, subdivision] (d), the CLRA, and the common count and the Court will determine the amount owed under the UCL and the claim for unjust enrichment." Since the court anticipated significant overlap between the evidence relevant to both the court-tried issues and those the jury would be required to decide, it ruled that all issues would be presented in a single trial, and that the court and jury would then decide their respective issues at the conclusion of the evidence. By order dated April 17, 2008, the court denied Plaintiffs' motion to try the issues of federal preemption, alternate performance, and invalidity of the ETF's to the jury in an advisory capacity. Trial commenced on May 12, 2008.

*Plaintiffs' Evidence*

Plaintiffs contended that the ETF's were adopted and utilized by Sprint to stop erosion of its customer base by penalizing early termination of customer contracts, and as a revenue opportunity. The majority of Plaintiffs' case was presented through the deposition testimony of Sprint employees, and through their expert Dr. Lee L. Selwyn.[10]

Testimony concerning Sprint's initial decision to adopt a $150 ETF was presented by Plaintiffs through the video deposition of Bruce Pryor, Sprint's

---

[9] The court also overruled Plaintiffs' demurrers to the cross-complaint, which had argued that Sprint's claims were only hypothetical and contingent and therefore failed to state a present cause of action.

[10] Class representative Jeweldean Hull and Sprint customers Linda McKenzie and Jerry Deganos also testified that they incurred and paid ETF's.

vice-president of consumer marketing. In 1999, Sprint began to study the concept of term contracts with ETF's as a means to reduce its "churn" rates,[11] and tested use of ETF's in selected markets. Sprint reported monthly wireless churn rates in 1998 of 3.3 percent, and in 1999 of 3.4 percent. Sprint adopted term contracts incorporating the $150 ETF nationwide in May 2000. Sprint reduced its churn rate to 2.8 percent in 2000.

The decision to implement ETF's was made by Pryor and members of Sprint's marketing team, including: Rob Vieyra, director of pricing; Chip Novick, vice-president of marketing; Chuck Levine, chief marketing officer; and Andy Sukawaty, president of Sprint's wireless division. Sprint had no surviving documentation relating to its decision to adopt ETF's. Plaintiffs introduced contemporaneous Sprint internal documents referring to the ETF as a "$150 contract penalty fee," and as a "Penalty or Contract Cancellation Fee."

After Sprint's August 2005 merger with Nextel, Sprint increased the amount of the early termination fee to $200. Sprint's postmerger $200 ETF was based on Nextel's premerger ETF. There was no evidence of any cost study made in connection with Nextel's initial adoption of its $200 ETF (also in 2000), and Nextel did not prepare any written analysis of its decision to implement ETF's.

It was undisputed that Sprint assessed ETF's totaling $299,473,408 during the class period, and collected $73,775,975. Dr. Selwyn opined that, as a result of early contract terminations, Sprint avoided capital expenditures and variable costs, which were equal to about 98.6 percent of its monthly recurring charges. He calculated Sprint's total lost profits from early terminations over the entire class period at $17,619,322.

*Sprint's Evidence*

ETF's are included in one-year and two-year term contracts, which offer heavily subsidized handsets and relatively low monthly charges, but are not included in month-to-month service plans. Sprint's experts contended that an ETF is a part of the price the consumer pays for the "bundle" of the handset and cellular service, and is part of the quid pro quo for the rate reductions included in long-term plans. (See *In re Ryder Communications, Inc. v. AT&T Corp.* (2003) 18 F.C.C.R. 13603, ¶ 33.) Therefore, Sprint argued, any state law claim challenging use of ETF's was preempted under federal law by the provisions of the federal Communications Act of 1934 (FCA; 47 U.S.C. § 151 et seq.), as amended in 47 United States Code section 332(c)(3)(A) (hereafter, section 332(c)(3)(A)).

---

[11] "Churn" is an index of the number of customers, reported as a percentage, that discontinue service on a monthly basis.

To contest Plaintiffs' claims that the ETF's were unlawful liquidated damage provisions, and in support of its cross-complaint, Sprint sought to prove that its actual damages were substantially greater than the fees charged. Its trial evidence included information concerning Sprint's costs, revenues, the frequency and timing of early terminations, and its efforts to collect ETF's. Douglas M. Smith, Sprint's chief technical operations officer, testified concerning Sprint's network capacity. Wallace Souder, Jr., vice-president of pricing, testified as to Sprint's costs and pricing practices, and Jay Michael Franklin, director of wireless service revenue, explained Sprint's collections practices. Sprint presented three expert witnesses. Christian Dippon testified about the size of the Sprint ETF payer class, the timing of the contract terminations, and the revenues that Sprint contended that it lost as a result. Jeffrey Baliban gave evidence concerning costs that Sprint avoided as a result of the early terminations. Dr. William E. Taylor calculated the amount of damages Sprint claimed as a result of the early terminations. Sprint calculated that the payer class had 1,986,537 members; early terminations, on average, occurred with 13.25 months left on the term of the contract; and early terminations caused Sprint to lose $49.16 per month in monthly recurring charges. Baliban testified that costs avoided when a class member terminated early equaled about 18 percent of Sprint's monthly recurring charges. Dr. Taylor opined that Sprint suffered damages of $987 million from early terminations, consisting of Sprint's net revenue loss (monthly recurring charges lost minus costs avoided), less the amount of ETF's actually collected.

*The Jury Verdict*

On June 12, 2008, the jury returned a verdict with special findings as follows: "1. What is the total dollar amount of early termination fees that plaintiffs and the class members paid to Sprint? $73,775,975. [¶] 2. Did plaintiffs and the class members breach their contracts with Sprint? Yes. [¶] 3. State the total dollar amount of Sprint's actual damages, if any, caused by early terminations of plaintiffs' and class members' contracts: $225,697,433." The damages found by the jury were the exact amount of ETF's charged to class members, but which were unpaid.

*The Trial Court's Statement of Decision*

On December 4, 2008, after considering objections to its proposed statement of decision, the trial court issued its statement of decision. The court first reviewed the trial evidence presented and made its findings of fact. It initially accepted the jury's determination of Sprint's damages from early termination of consumer contracts in the amount of $225,697,433.

The court first held that section 332(c)(3)(A), denying states the authority to "regulate . . . the rates charged" by cellular telephone carriers, did not preempt Plaintiffs' challenge to the ETF's because the ETF's were not "rates."

The court found that the ETF in this case operated primarily as a liquidated damage clause. It also found Sprint's ETF's to be unenforceable penalties under section 1671, subdivision (d) because, although Sprint had established that it was impracticable to calculate the amount of actual damages from a breach at the inception of the contract, it had failed to meet its burden of establishing that it had made genuine and nonpretextual efforts to estimate a fair average compensation for the losses anticipated to be sustained (citing *Hitz v. First Interstate Bank* (1995) 38 Cal.App.4th 274, 291 [44 Cal.Rptr.2d 890] (*Hitz*) [employing the reasonable endeavor test]).

The court determined that Sprint could not justify the ETF's as a negotiated "alternative means of performance" under the contract, since they were invoked as liquidated damages upon a breach of the contract.

As a consequence of its determination that the ETF's were unlawful under section 1671, subdivision (d), the court found that Plaintiffs had prevailed on their claims for violations of the CLRA (§ 1770, subd. (a)(14), (19)), UCL (Bus. & Prof. Code, § 17200 et seq.), unjust enrichment, and for money had and received. The court ordered restitution to the class in the amount of collected ETF's ($73,775,975); enjoined Sprint from further efforts to collect ETF's assessed during the class period; and ordered Sprint to advise third party assignees of uncollected claims of the court's order. The court then, while questioning the validity of the jury's verdict on damages, applied the setoff in favor of Sprint resulting from the jury's verdict and determined that neither the class nor Sprint would be entitled to any monetary recovery. The setoff did not affect the injunctive relief granted.

Judgment was entered on December 24, 2008.

*The Motion for New Trial*

On December 15, 2008, Plaintiffs filed a notice of intention to move for a new trial on the jury's verdict on questions 2 and 3, and the court's calculation of the setoff. Plaintiffs contended that the court's rulings and instructions had led the jury to presume the ETF's were valid, to find breach of contract based on nonpayment of the ETF's, and to award the amount of unpaid ETF's instead of determining Sprint's actual damages.

On January 27, 2009, the trial court granted Plaintiffs' motion for new trial on the issue of actual damages (question 3) and on the setoff calculation. In granting the motion for new trial on the issue of Sprint's actual damages (question 3), the court observed that it was "inconceivable that the jury considered the days of comprehensive and complex testimony by Dr. Selwyn, Mr. Baliban, and Dr. Taylor regarding Sprint's lost revenue and avoidable costs and determined that Sprint's actual total economic damages from all class members were exactly equal to the amount of unpaid ETF's due from those class members who had not paid the ETF" and that the "finding that Sprint's actual damages were $225,697,433 compels the conclusion that the jury did not follow the instructions to determine Sprint's actual total economic damages." It considered alternative methods that the jury could have used to reach its verdict and concluded that "[t]here is no way to read the jury's answer to question #3 that yields a result that is both reasonable and lawful. The lawful readings are not reasonable and the reasonable readings are not lawful." The grant of a new trial on damages necessarily required a new trial on the setoff to Sprint.

The court denied Plaintiffs' motion for new trial on the issue of breach of contract by the class members (question 2), on the ground that there was substantial evidence in the record to support the jury's implicit finding that the class members only incurred ETF's as a consequence of breaching their contracts with Sprint.

*The Appeals*

On January 8, 2009, Sprint filed its notice of appeal from the December 24, 2008 judgment entered on the trial court's statement of decision (appeal No. A124077). On February 5, 2009, Sprint filed its notice of appeal from the January 27, 2009 order granting in part Plaintiffs' motion for new trial (appeal No. A124095). On February 17, 2009, Plaintiffs filed a timely notice of appeal from the December 24, 2008 judgment (appeal No. A125311), including the portion of the jury's verdict finding that the class had breached its contracts with Sprint.

## II. Discussion

### A. *Federal Preemption*

"Congress has the power to preempt state law under the supremacy clause of the United States Constitution (art. VI, cl. 2). [Citation.] Congress's intent to preempt may be expressly stated or implied where a federal law

demonstrates an intent to ' "occupy the field" ' or a state law conflicts with a federal law. [Citation.] A conflict exists where compliance with both state and federal law is impossible, or where a state law ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371 [104 Cal.Rptr.2d 197] (*Spielholz*).)

"To determine whether Congress intended to preempt state law with respect to a particular activity, we focus on the nature of the activity that the state seeks to control or regulate rather than on the method of regulation adopted. [Citation.] Preemption therefore applies not only to positive enactments by legislation or regulation but also to judicial acts that interfere or conflict with congressional intent. [Citation.] [¶] Congress's intent to preempt must be 'clear and manifest' to preempt state law in a field traditionally occupied by the states, such as the exercise of a state's police powers." (*Spielholz, supra*, 86 Cal.App.4th at pp. 1371–1372; see also *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1475 [38 Cal.Rptr.3d 653] (*Smith*).)

1. *Standard of Review*

The trial court considered and rejected the preemption claim. Finding the ETF to function primarily as a liquidated damage clause subject to California consumer protection statutes, the court applied a presumption against preemption. It found that Sprint had failed to meet its burden of demonstrating preemption, and that "[a] contractual agreement to replace a calculation of actual damages with liquidated damages does not transmute the calculation of contract damages (a traditional state function) into a wireless carrier's 'rate' (a federal concern)."

In its opening brief, Sprint suggested that the preemption issue is entirely one of law, subject to de novo review. Plaintiffs assert that the court's ruling was based primarily on findings of fact from the evidence presented at trial, and that our review is limited to examining the record for substantial evidence to support the court's findings. In fact, they contend that Sprint has waived review of this issue by failing to address the evidence considered by the court, presenting only the evidence favorable to Sprint, and by failing to fully and fairly discuss the conflicting evidence. (See *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 [58 Cal.Rptr.3d 527].) In its reply brief, Sprint acknowledges that the court's ruling involved mixed questions of fact and law, but asserts that Sprint is challenging the legal standards employed by the trial court and the application of those standards to the trial court's factual findings—not the findings themselves—and that such rulings are reviewable de novo.

Neither party is entirely correct. "The party claiming federal preemption bears the burden of establishing it. [Citation.]" (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 730 [44 Cal.Rptr.3d 733] (*Pacific Bell Wireless*).) "When the issues regarding federal preemption involve undisputed facts, it is a question of law whether a federal statute or regulation preempts a state law claim and, on appeal, we independently review a trial court's determination on that issue of preemption. [Citations.]" (*Smith, supra,* 135 Cal.App.4th at p. 1476.) And insofar as the court resolved disputed issues of fact, its findings are reviewed under the substantial evidence standard, i.e., they will be sustained unless shown to lack substantial evidentiary support. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1136–1137 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *Howard S. Wright Construction Co. v. Superior Court* (2003) 106 Cal.App.4th 314, 320 [130 Cal.Rptr.2d 641].)

### 2. *Application of the FCA*

█ The FCA "grants the Federal Communications Commission (FCC) broad authority over interstate and foreign communication by wire or radio, to secure and protect the public interest and to insure uniformity of regulation." (Annot., Construction and Application of the Communications Act of 1934 and Telecommunications Act of 1996—United States Supreme Court Cases (2008) 32 A.L.R.Fed.2d 125.) In 1993 Congress amended the FCA (47 U.S.C. § 151 et seq., as amended by the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002 (Aug. 10, 1993) 107 Stat. 312, 387–397) to provide in relevant part that "no State or local government shall have any authority to regulate the entry of or *the rates charged* by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating *the other terms and conditions* of commercial mobile services. . . ." (§ 332(c)(3)(A), italics added.)[12]

"By enacting section 332(c)(3)(A) in 1993, Congress 'dramatically revise[d] the regulation of the wireless telecommunications industry, of which cellular telephone service is a part.' [Citations.] 'To foster the growth and development of mobile services [i.e., cellular and related mobile wireless communications] that, by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure, new section 332(c)(3)(A) . . . preempt[s] state rate and entry regulation of all commercial mobile services,' but permits state regulation of 'other terms and conditions.'

---

[12] The FCA also has a "savings clause" which states: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." (47 U.S.C. § 414.)

(H.R.Rep. No. 103-111, 1st Sess., at p. 260, reprinted in 1993 U.S. Code Cong. & Admin. News, pp. 378, 587; 47 U.S.C. § 332.)" (*Ball v. GTE Mobilnet of California* (2000) 81 Cal.App.4th 529, 534 [96 Cal.Rptr.2d 801].) While only briefly discussing the meaning of "rate regulation," the report of the House Budget Committee elaborated that " '[b]y "terms and conditions," the committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (*e.g.*, zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions." ' " (*Cellco Partnership v. Hatch* (8th Cir. 2005) 431 F.3d 1077, 1080, quoting H.R.Rep. No. 103-111, *supra*, 1993 U.S. Code Cong. & Admin. News, p. 588.)

Sprint contends that ETF's are an integral part of its rate structure and that Plaintiffs' claims are consequently expressly preempted by section 332(c)(3)(A). Plaintiffs argue that Sprint failed to meet its evidentiary burden of establishing that ETF's are an element of its rates, and that ETF's fall within the "other terms and conditions" provision of section 332(c)(3)(A), leaving them subject to state jurisdiction.

In *Spielholz*, cellular service provider AT&T contended that section 332(c)(3)(A) preempted state law claims of false advertising as to AT&T's service coverage. (*Spielholz, supra*, 86 Cal.App.4th at p. 1369.) The class action plaintiffs in *Spielholz* sought injunctive and monetary relief, including damages and restitution. AT&T argued that for the court to award damages or restitution based on false advertising it must determine the value of the services provided and the reasonableness of the rates charged, and that such a determination would be expressly preempted as rate regulation within the meaning of section 332(c)(3)(A). (*Spielholz*, at pp. 1369–1370.)

The Court of Appeal first stayed resolution of appellate proceedings to allow the FCC (Federal Communications Commission) to consider a petition filed by Wireless Consumers Alliance, Inc., regarding the preemptive scope of section 332(c)(3)(A).[13] (*Spielholz, supra*, 86

---

[13] "In general, an agency's interpretation of statutes within its administrative jurisdiction is given presumptive value as a consequence of the agency's special familiarity and presumed expertise with satellite legal and regulatory issues. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] . . . .)" (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194 [13 Cal.Rptr.3d 630].)

Cal.App.4th at p. 1370.) That petition before the FCC sought a declaratory ruling as to whether the FCA would preempt state courts from awarding monetary relief against cellular service providers: "(a) for violating state consumer protection laws prohibiting false advertising and other fraudulent business practices, or (b) in the context of contractual disputes and tort actions adjudicated under state contract and tort laws." (*In re Wireless Consumers Alliance, Inc.* (2000) 15 F.C.C.R. 17021, ¶ 1, fn. omitted (*Wireless Consumers*).) The FCC noted its prior declaratory ruling in *In re Southwestern Bell Mobile Systems, Inc.* (1999) 14 F.C.C.R. 19898, in which it found that the language and the legislative history of 47 United States Code section 332 did not support the preemption of state contract or consumer fraud laws relating to the disclosure of rates and rate practices. (*Wireless Consumers*, at ¶ 14.) For the same reasons, it found that the language and legislative history of 47 United States Code section 332 did not support the view that state courts are, as a general matter, prevented by section 332(c)(3)(A) from awarding damages to customers of cellular service providers based on violations of state contract or consumer fraud laws. (*Wireless Consumers*, at ¶ 14.) The FCC therefore determined that awarding monetary damages is not necessarily equivalent to rate regulation. (*Id.* at ¶ 23.) "We agree with those commenters who contend that [47 United States Code s]ection 332 was designed to promote the [commercial mobile radio service (CMRS)[14]] industry's reliance on competitive markets in which private agreements and other contract principles can be enforced. It follows that, if CMRS providers are to conduct business in a competitive marketplace, and not in a regulated environment, then state contract and tort law claims should generally be enforceable in state courts." (*Wireless Consumers*, at ¶ 24, fn. omitted.) The FCC concluded: "A state court, by awarding damages to customers damaged by a CMRS provider's breach of contract or fraud violation, would not *per se* be engaged in ratemaking prohibited by [47 United States Code s]ection 332(c)(3) . . . ." (*Wireless Consumers*, at ¶ 38.) It further concluded that 47 United States Code section 332 "does not generally preempt state court award of monetary damages," and thus there is "no inherent conflict between state common law or statutory remedies and the [FCA] . . . ." (*Wireless Consumers*, at ¶ 37.) The FCC cautioned, however, that while 47 United States Code section 332 does not generally preempt damage awards based on state contract or consumer protection laws, the question of whether a specific damage award or a specific grant of injunctive relief constitutes rate regulation prohibited by 47 United States Code section 332(c)(3) would depend on all facts and circumstances of the case. (*Wireless Consumers*, at ¶ 39.)

Following the FCC's decision, the *Spielholz* court vacated the stay and rejected the preemption claim. It observed that only rate regulation was

---

[14] The statutory definition of "commercial mobile service" includes wireless telephone service providers. (See 47 U.S.C. § 332(d)(1), (2).)

directly prohibited by the FCA and held that express preemption did not apply even if a monetary damage award required determination of the value of AT&T's service, since such a determination lacked a principal purpose and direct effect of controlling the provider's rates and any effect on rates was merely incidental. (*Spielholz, supra*, 86 Cal.App.4th at pp. 1373, 1375–1376.) "In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an attempt to regulate rates and therefore is preempted under section 332(c)(3)(A); a claim that directly challenges some other activity, such as false advertising, and requires a determination of the value of services provided in order to award monetary relief is not rate regulation." (*Id.* at pp. 1374–1375.)

The FCC has not yet ruled upon the question of whether ETF's constitute "rates charged" under section 332(c)(3)(A), such that state law claims are preempted.[15] Only one California appellate case has addressed ETF's at all, albeit in a slightly different context. In *Pacific Bell Wireless*, California's Public Utilities Commission (PUC) imposed fines and restitution orders against Pacific Bell Wireless, LLC, doing business as Cingular Wireless (Cingular) for, among other things, what the PUC found to be the unjust and unreasonable practice of charging its customers an ETF without permitting any type of grace period. (*Pacific Bell Wireless, supra*, 140 Cal.App.4th at p. 723.) The court rejected Cingular's claim that the PUC decision was preempted by section 332(c)(3)(A). "The [PUC's] decisions do not directly challenge Cingular's rates, nor do they require Cingular to make any specific changes to its infrastructure. As in *Spielholz* . . . , the [PUC's] challenge to the ETF and to Cingular's policy of permitting no grace period,

---

[15] On February 22, 2005, SunCom Wireless Operating Company, LLC, filed a petition with the FCC for a declaratory ruling (FCC Docket No. WT05-193), asking that the FCC determine that early termination fees charged to commercial mobile radio service customers are rates charged under section 332(c)(3)(A). (70 Fed.Reg. 38926, 38927 (July 6, 2005); see also *Edwards v. SunCom* (2006) 369 S.C. 91 [631 S.E.2d 529, 530]; *Waudby v. Verizon Wireless Services, LLC* (D.N.J., May 25, 2007, Civ. A. No. 07-470(FLW)) 2007 U.S.Dist. Lexis 38581 (*Waudby*).) The FCC also sought public comment on a separate petition raising similar issues. (See 70 Fed.Reg. 38926, 38927, 38928 (July 6, 2005) ["Wireless Telecommunications Bureau Seeks Comment on Petition for Declaratory Ruling Filed by CTIA Regarding Whether Early Termination Fees Are 'Rates' Within 47 U.S.C. 332(c)(3)(A), Public Notice, WT Docket No. 05-194, DA 05-1389 (rel. May 18, 2005)." (italics omitted)].)

We grant Plaintiffs' December 14, 2010 request for judicial notice of a June 12, 2009 letter in which the cellular industry group, CTIA, withdrew its petition for expedited declaratory ruling (FCC Docket No. WT05-194). We also take judicial notice of the fact that the FCC has sent inquiries to cellular service providers asking for information on use of ETF's and is examining that information in preparation for a "Notice of Proposed Rulemaking" dealing with a number of consumer issues, including ETF's. (U.S. Gov. Accountability Off., Enhanced Data Collection Could Help FCC Better Monitor Competition in the Wireless Industry, GAO-10-779 (July 2010) p. 35; Evid. Code, § 459.) It appears safe to say that any action by the FCC on this issue is not imminent.

combined with the misrepresentations regarding service, is not a preempted regulation of rates or of market entry. The principal purpose and direct effect of the penalties imposed by the [PUC] are to prevent misrepresentations by Cingular and to compensate the wireless customers who paid ETF's. The effect of these penalties on Cingular's rates is incidental, and the [PUC's] decisions are therefore not preempted by . . . section 332(c)(3)(A)." (*Pacific Bell Wireless*, at p. 734.) While Plaintiffs argue that the court in the *Pacific Bell Wireless* decision "definitively determined" that Cingular's ETF was not a " 'rate charged' " (*Pacific Bell Wireless*, at p. 732) for service under section 332(c)(3)(A), the precise issue before the court, as Sprint points out, was whether the PUC's orders were preempted by section 332(c)(3)(A), not whether the ETF's were rates within the meaning of the statute. The PUC, in its decision, focused upon the conditions under which Cingular imposed the ETF. It made "no findings on whether imposition of an ETF [was] unreasonable per se," or "what amount, if any, [would] constitute[] a reasonable or unreasonable ETF." (*Pacific Bell Wireless LLC doing business as Cingular Wireless* (Cal.P.U.C. Sept. 23, 2004) Dec. No. 04-09-062 [2004 Cal.P.U.C. Lexis 453, pp. *77–*78].) The PUC held that Cingular's legal culpability stemmed from imposing a no return/no refund ETF from day one of the contract period without providing any trial period. (*Id.* at p. *125.) Neither the PUC nor the Court of Appeal determined whether the ETF itself was a rate charged subject to federal preemption.

Nor have we found reported appellate authority from any other jurisdiction on this point. Contrary to Plaintiffs' assertion, there is no "overwhelming weight of authority" that state law challenges to ETF's are not preempted rate regulation. Trial courts considering the question have reached conflicting conclusions.[16] (See, e.g., *Phillips v. AT&T Wireless* (S.D. Iowa, July 29, 2004, No. 4:04-cv-40240) 2004 U.S.Dist. Lexis 14544, pp. *35–*37; *Iowa v. United States Cellular Corp.* (S.D. Iowa, Aug. 7, 2000, No. 4-00-CV-90197) 2000 U.S.Dist. Lexis 21656, p. *20; *Cedar Rapids Cellular Telephone LP v. Miller* (N.D. Iowa, Sept. 15, 2000, No. C00-58 MJM) 2000 U.S.Dist. Lexis 22624, pp. *20–*21 [holding that an ETF is not a rate]; *Esquivel v. Southwestern Bell Mobile Systems, Inc.* (S.D.Tex. 1996) 920 F.Supp. 713, 715 ["liquidated damage provision here is a 'term and condition' of the agreement rather than a rate"]; cf. *Redfern v. AT&T Wireless Services, Inc.* (S.D.Ill., June 16, 2003, Civ. No. 03-206-GPM) 2003 U.S.Dist. Lexis 25745, pp. *2–*3 [challenge to ETF preempted since ETF's are " 'an integral part of the rates charged by [the defendant] for its services' under its wireless service agreements"]; *Chandler v. AT&T Wireless Services, Inc.* (S.D.Ill., July 21, 2004,

---

[16] For a summary of approaches taken in different jurisdictions, see Everard, *Early Termination Fees: Fair Game or Federally Preempted?* (2009) 77 Geo.Wash. L.Rev. 1033, 1035.

Civ. No. 04-180-GPM) 2004 U.S.Dist. Lexis 14884, p. *4 [ETF charges "directly connected to the rates charged for mobile services"].) Other courts have elected to stay state law based ETF challenges awaiting FCC guidance on the issue. (See *Waudby, supra,* 2007 U.S.Dist. Lexis 38581 at pp. *18–*19; *Gentry v. Cellco P'ship* (C.D.Cal., Mar. 22, 2006, No. CV 05-7888 GAF (VBKx)) 2006 U.S.Dist. Lexis 97876.)

### a. *Factual Issues*

As we have discussed, Sprint's position is that this court should review the trial court's rejection of the preemption defense de novo.[17] It is clear that the trial court considered the question of federal preemption here as a mixed issue of law and fact. So do we.

We first observe that while the FCC has still to address the ETF question, it has suggested that the issue of rate preemption under section 332(c)(3)(A) is, at least to some degree, fact intensive. (*Wireless Consumers, supra,* 15 F.C.C.R. 17021, at ¶ 39.) While concluding that there is "no inherent conflict between state common law or statutory remedies and the [FCA]," the FCC nevertheless cautioned that the question of whether a specific damage award or a specific grant of injunctive relief based on state contract or consumer protection laws constitutes rate regulation prohibited by section 332(c)(3)(A) would depend on all facts and circumstances of the case. (*Wireless Consumers,* at ¶¶ 37, 39.)

The trial court took this approach. By order of January 20, 2004, the original coordination judge overruled a demurrer to the ETF claims based on an argument of federal preemption by section 332(c)(3)(A), finding that the factual allegations of the pleadings were "unsettled," and that evaluation of whether ETF's were rates "will require a decision based on consistent pleadings or an evidentiary record on summary judgment or at trial. [Citation.]" In its March 17, 2008 pretrial order, the trial judge denied Plaintiffs'

---

[17] Sprint cites *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077 [72 Cal.Rptr.3d 112, 175 P.3d 1170] for the proposition that federal preemption is a pure question of law. (*Id.* at p. 1089, fn. 10.) However, that case had been resolved in the trial court on demurrer, and the facts were therefore undisputed. (*Ibid.*) Further, the defendants there asserted that the plaintiffs' claims were impliedly preempted. (*Id.* at p. 1089.) " 'Three forms of preemption may occur: (1) where Congress expressly specifies that its enactment preempts state law (express preemption); (2) where the scheme of federal regulation is so pervasive that there is a reasonable inference Congress intended to dominate the field and state laws on the same subject are precluded (field preemption); and (3) where federal law actually conflicts with state law and it is impossible for a private party to comply with both requirements (conflict preemption). [Citations.]' [Citation.]" (*Smith, supra,* 135 Cal.App.4th at p. 1476, fn. omitted.)

The issue here is one of express preemption. (See also *Pacific Bell Wireless, supra,* 140 Cal.App.4th at p. 735 [discussing the preemptive effect of § 332(c)(3)(A) and concluding "the doctrine of implied preemption is inapplicable in this case"].)

motion for judgment on the pleadings on the federal preemption affirmative defense, stating that "[t]he court is not persuaded that it can resolve the preemption issue as a pleading issue any more now than it could in 2004."[18] The court said that it would decide at trial if the ETF's were rates under section 332(c)(3)(A).

Sprint contends that undisputed evidence at trial showed that its ETF's are an element of the prices it charged, and that the ETF's are an "integral part of Sprint's rate structure." Sprint points to testimony of one of its experts (Taylor) that ETF's are "potentially one of the prices you pay" under Sprint's cell phone plans. According to Taylor, cell phone service is a package with separate prices for its individual components, and just as customers are charged under some contracts if they decide to "roam" outside a geographic area, "if you decide to leave early, there may be an early termination price." Sprint contends that Plaintiffs' expert, Dr. Selwyn, agreed, conceding on cross-examination that ETF's "are a form of payment for the handsets and cellular service that Sprint provides with its long-term contracts," with customers paying for the handset "in three ways: up-front charges for the contract, recurring monthly service charges, and what Selwyn characterized as the 'liquidated damages payment in the event of breach of the installment contract.' " Sprint says that the evidence shows that ETF's are an integral part of its rate structure because they are included in one-year and two-year term contracts, which offer heavily subsidized handsets and relatively low monthly charges, but not in its month-to-month service plans. Therefore, ETF's are, they claim, part of the *"quid pro quo* for the rate reductions included in long-term plans." (*In re Ryder Communications, Inc. v. AT&T Corp., supra*, 18 F.C.C.R. 13603, at ¶ 33.)

As Plaintiffs correctly observe, however, Sprint ignores the evidence considered by the trial court, and set forth in its statement of decision, as to the "factual nature of the ETF." The trial judge discussed the evidence concerning the "true nature" of Sprint's ETF, "which the Court discerns by looking at its objective effect on commerce generally and its effect on the majority of Sprint's customers specifically," and found that "Sprint's ETF operated primarily as a liquidated damage clause." The court cited the testimony of Bruce Pryor, who testified that Sprint's goal in adopting the ETF was to control churn and was implemented, as was Nextel's similar charge, "primarily as a means to prevent customers from leaving." It noted that Sprint "did no analysis that considered the lost revenue from contracts, the avoidable costs, and Sprint's expected lost profits from contract terminations." The ETF's were set "from a competitive standpoint," and "Sprint's early evaluations of the ETF assumed that Sprint would not collect any money from the

---

[18] Another order of October 6, 2006, also dealing with this issue, is not part of the record.

ETFs." The trial court also found that several different versions of Sprint's form subscriber agreements all referred to the ETF as "liquidated damages." Sprint did not challenge the court's findings in its opening brief, and expressly states in its reply brief that it "is challenging the legal standards employed by the trial court and the application of those standards to the trial court's factual findings, not the findings themselves." We find, in any event, that the court's findings are supported by substantial evidence.

### b. *Presumption Against Preemption*

The interpretation and application of the federal law at issue "is further informed by a strong presumption against preemption. [Citations.] '[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," [citation], we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." [Citations.]' [Citations.]" (*Farm Raised Salmon Cases, supra*, 42 Cal.4th at p. 1088; see *Smith, supra*, 135 Cal.App.4th at p. 1475.) "We apply this presumption to the *existence* as well as the *scope* of preemption. [Citation.]" (*Farm Raised Salmon Cases*, at p. 1088.) "Considering the general presumption against preemption, we narrowly construe the precise language of the federal law or regulation to determine whether a particular state law claim is preempted. [Citations.]" (*Smith*, at p. 1476.)

Sprint argues that the presumption against preemption is not triggered when the state regulates in an area, like communications law, where there has been a history of significant federal presence. This again is an "implied preemption" argument not applicable here. In *Spielholz*, the court rejected a claim of implied preemption, finding that the FCA does not evidence an intent to "occupy the field" by precluding other remedies than petition to the FCC to address a service provider's classifications, practices and regulations, and that a potential federal remedy is not necessarily inconsistent with state remedies, as acknowledged by the saving clause within the statute. (*Spielholz, supra*, 86 Cal.App.4th at p. 1376.) "Moreover, the availability of state law remedies is consistent with the 1993 amendments' objective to achieve maximum benefits for consumers and providers through reliance on the competitive marketplace, in which state law duties and remedies ordinarily are enforceable. [Citation.]" (*Id.* at pp. 1376–1377, citing *Wireless Consumers, supra*, 15 F.C.C.R. 17021, at ¶¶ 22, 24.) Furthermore, even without a presumption

against preemption, "because preemption of state laws by federal law or regulation generally is not favored, the party claiming federal preemption . . . has the burden to show specific state law claims are preempted. [Citations.]" (*Smith, supra*, 135 Cal.App.4th at pp. 1475–1476, fn. omitted.)

### c. *FCA Does Not Preempt Application of California Law to Sprint's ETF's*

The trial court found that Sprint failed to meet its burden of establishing preemption. We agree.

■ There is a distinction between rates that are filed with an agency and subject to public and regulatory review, and prices that are determined and published by the carrier in a competitive marketplace.[19] (*Wireless Consumers, supra*, 15 F.C.C.R. 17021, at ¶ 20.) Sprint argues that it subsidizes its charges to customers for equipment and sets its charges for service on the assumption that it will recover its costs over the term of its fixed contracts, and that the ETF's compensate it for its losses when a customer fails to fulfill the full contract term. But this argument actually confirms that Sprint's *rates* for equipment and services are established at a level to provide its full projected return on investment over the contract term, assuming that the customer fulfills his or her obligations. Only if a customer failed to do so would Sprint suffer any loss of anticipated revenue, with the amount of that loss dependent upon when the customer default occurred.

But the ETF's were not prorated, so that the customer would pay the same amount whether the termination occurred during the first month or the last

---

[19] Under the FCA, common carriers engaged in interstate or foreign wire or radio communication must file with the FCC a schedule or tariff showing all charges and the classifications, practices, and regulations affecting those charges. (47 U.S.C. § 203(a).) The contents of the tariff are subject to FCC approval, and the FCC may determine and prescribe just and reasonable charges, classifications, practices, and regulations. (47 U.S.C. §§ 204(a), 205(a).) The filed rate doctrine forbids a regulated entity from charging rates "for its services other than those properly filed with the appropriate federal regulatory authority" (*Arkansas Louisiana Gas Co. v. Hall* (1981) 453 U.S. 571, 577 [69 L.Ed.2d 856, 101 S.Ct. 2925]), and it has been held to preempt a customer's state law claims relating to a tariffed communications service. (*Wireless Consumers, supra*, 15 F.C.C.R. 17021, at ¶¶ 15, 16; see also *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 221–222 [141 L.Ed.2d 222, 118 S.Ct. 1956] [filed rate doctrine applies to FCA].)

The 1993 amendments to the FCA authorized the FCC to exempt wireless telephone service from the tariff filing requirement, and it did so in 1994. The FCC has a different regime for cellular telephone service, in which the provider-customer relationship is not governed by terms set out by carriers in regulatory tariff filings, but by the mechanisms of a competitive marketplace. Since cellular telephone providers are not required to file rates with the FCC, they are not subject to the filed rate doctrine. (*Wireless Consumers, supra*, 15 F.C.C.R. 17021, at ¶¶ 15–22; *Spielholz, supra*, 86 Cal.App.4th at pp. 1372, 1377–1378.)

month of the contract term. More significantly, the court found that Sprint, in implementing ETF's, "did no analysis that considered the lost revenue from contracts, the avoidable costs, and Sprint's expected lost profits from contract terminations," and that "Sprint's early evaluations of the ETF assumed that Sprint would not collect any money from the ETFs."[20] The ETF's were not based on the amount of any actual or estimated loss, but "from a competitive standpoint." Sprint's purpose in adopting the ETF was to control churn and was implemented "primarily as a means to prevent customers from leaving." In other words, the ETF's were intended not to be a collectible element of Sprint's rates, but rather to serve as a deterrent—either coercing customer compliance with the contract rate structure or penalizing noncompliance. But as we discuss *post*, Sprint runs afoul of California consumer protections in doing so. Simply labeling an ETF as a rate because it is charged to certain customers does not make it one.

It is certainly possible that elimination of ETF's may indirectly affect Sprint's rates to the extent that Sprint incurs costs in pursuing alternative remedies for contractual breach or that it would reserve for losses attributable to a potentially higher level of customer defaults. Sprint would presumably factor actual or projected lost revenue into its rate structure. We agree with the *Spielholz* court, however, that "[r]ate regulation, or to 'regulate . . . the rates charged' in the words of section 332(c)(3)(A), refers . . . to an action whose principal purpose and direct effect are to control prices. . . . [¶] . . . [¶] A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control rates." (*Spielholz, supra*, 86 Cal.App.4th at pp. 1373–1374.) In *Ball v. GTE Mobilnet of California*, the court, while finding federal preemption of state law claims contesting "rounding up" of per minute charges for wireless calls, distinguished cases involving "billing practices" having "only a tangential relationship to the actual rates for service paid by cellular customers" (including *Esquivel v. Southwestern Bell Mobile Systems, Inc., supra*, 920 F.Supp. 713 [finding a charge for early termination of cellular service to be a "term and condition" of service, not a rate, and therefore subject to state regulation]). (*Ball v. GTE Mobilnet of California, supra*, 81 Cal.App.4th at pp. 539, 541.)

Although not directly on point, we also find the reasoning in *Pacific Bell Wireless*, in a closely related context, persuasive. Upholding imposition of penalties and a restitution order issued by the PUC against Cingular for,

---

[20] In 2003, Sprint's collection rate for assessed ETF's was only about 7 percent, and "92% of ETF charges were written-off or adjusted. . . ." Sprint's corporate audit services conducted a review of ETF collection practices in 2003 "to identify potential revenue opportunities." Since 2004, Sprint has increased its collection rate to about 20 to 25 percent of assessed ETF's.

among other things, charging ETF's without any grace period for cancellation, our colleagues in the Fourth District Court of Appeal concluded that the PUC's decisions were not preempted by the FCA because they did not "directly challenge Cingular's rates, nor do they require Cingular to make any specific changes to its infrastructure." (*Pacific Bell Wireless, supra,* 140 Cal.App.4th at p. 734.) "The principal purpose and direct effect of the penalties imposed by the [PUC] are to prevent misrepresentations by Cingular and to compensate the wireless customers who paid ETF's. The effect of these penalties on Cingular's rates is incidental, and the [PUC's] decisions are therefore not preempted by [the FCA]." (*Ibid.*)

█ The trial court correctly held that "[a] contractual agreement to replace a calculation of actual damages with liquidated damages does not transmute the calculation of contract damages (a traditional state function) into a wireless carrier's 'rate' (a federal concern)." As the FCC has found, section 332(c)(3)(A) "was designed to promote the [wireless cellular] industry's reliance on competitive markets in which private agreements and other contract principles can be enforced. It follows that, if [cellular] providers are to conduct business in a competitive marketplace, and not in a regulated environment, then state contract and tort law claims should generally be enforceable in state courts." (*Wireless Consumers, supra,* 15 F.C.C.R. 17021, at ¶ 24, fn. omitted.)

Invalidation of the ETF's under California's consumer protection laws will have only an indirect and incidental effect on Sprint's rates and, therefore, is not preempted by section 332(c)(3)(A).

B. *Section 1671*[21]

The trial court found that an ETF operated primarily as a liquidated damage clause. Because Sprint failed to prove that, in adopting ETF's, it made any effort "to determine what losses it would sustain from breach by the early termination of its contracts" or "to estimate a fair average compensation for such losses," it failed to satisfy the reasonable endeavor test and the ETF's were consequently unlawful penalties under section 1671, subdivision (d).

█ A provision in a consumer contract "liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

---

[21] We incorporate here much of our discussion on this issue from our prior unpublished opinion in this case addressing subscriber class certification. (*In re Cellphone Termination Fee Cases, supra,* A115457.)

(§ 1671, subd. (d); see *id.*, subd. (c)(1).) Because liquidated damage clauses in consumer contracts are presumed void, the burden is on the proponent of the clause to rebut that presumption. (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 738 [108 Cal.Rptr. 845, 511 P.2d 1197] (*Garrett*).)

Decisions interpreting this statute have created a two-part test for determining whether a liquidated damages provision is valid: (1) fixing the amount of actual damages must be impracticable or extremely difficult, and (2) the amount selected must represent a reasonable endeavor to estimate fair compensation for the loss sustained. (*Utility Consumers' Action Network, Inc. v. AT&T Broadband of Southern Cal., Inc.* (2006) 135 Cal.App.4th 1023, 1029 [37 Cal.Rptr.3d 827] (*Utility Consumers*).) "Absent *either* of these elements, a liquidated damages provision is void . . . ." (*Hitz, supra,* 38 Cal.App.4th at p. 288, italics added.) A liquidated damages provision need not, however, be expressly negotiated by both parties to a form contract in order to be valid. (*Utility Consumers,* at p. 1035.)

Impracticability may be established by showing "that the measure of actual damages would be a comparatively small amount and that it would be economically impracticable in each instance of a default to require a [seller] to prove to the satisfaction of the [consumer] the actual damages by accounting procedures." (*Garrett, supra,* 9 Cal.3d at p. 742.) The trial court found that, although Sprint could readily calculate its lost monthly revenue per customer in the event of a default, it would have been impracticable to determine Sprint's avoidable costs, and therefore impracticable to determine actual damages at the inception of the contracts. Plaintiffs do not challenge this finding.

"Determining whether a reasonable endeavor was made depends upon both (1) the motivation and purpose in imposing the charges, and (2) their effect." (*Utility Consumers, supra,* 135 Cal.App.4th at p. 1029.) "[T]he focus is not . . . on whether liquidated damages are disproportionate to the loss from breach, but on whether they were *intended* to exceed loss substantially—a result of which is to generate a profit." (*Hitz, supra,* 38 Cal.App.4th at p. 289.) A liquidated damages provision that "bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach" is an unlawful penalty that compels a forfeiture upon a breach of contract. (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 [73 Cal.Rptr.2d 378, 953 P.2d 484].) Such penalties are " 'ineffective, and the wronged party can collect only the actual damages sustained.' [Citations.]" (*Id.* at p. 977.)

In order to establish the reasonable endeavor required, evidence must exist that the party seeking to impose liquidated damages " 'actually engaged in

some form of analysis to determine what losses it would sustain from [a] breach, and that it made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained.' " (*Hitz, supra,* 38 Cal.App.4th at p. 291.) The trial court made a finding that "when Sprint implemented the ETF in 2000, and increased it in 2005, it made no endeavor—reasonable or otherwise—to determine what losses it would sustain from breach or to estimate a fair average compensation for such losses." Sprint "did no analysis that considered the lost revenue from contracts, the avoidable costs, and Sprint's expected lost profits from contract terminations." The ETF amounts were set not based on the basis of any actual or estimated loss, but "from a competitive standpoint." Sprint's purpose in adopting the ETF was to control churn and was implemented "primarily as a means to prevent customers from leaving." After adoption of ETF's, Sprint succeeded in reducing its churn rate to 2.8 percent in 2000.

As discussed above, the court's findings are supported by substantial evidence. The testimony of Bruce Pryor, Sprint's vice-president of consumer marketing, was that Sprint began to study the concept of term contracts with ETF's in 1999 as a means to reduce its churn rates. The decision to implement ETF's was made by members of Sprint's marketing team. Contemporaneous Sprint internal documents referred to the ETF as a "$150 contract penalty fee," and as a "Penalty or Contract Cancellation Fee." Sprint's postmerger $200 ETF was based on Nextel's premerger ETF. The trial court found "no evidence at trial that Nextel did any analysis that considered the lost revenue from contracts, the avoidable costs, or Nextel's expected lost profits from contract terminations."

Sprint counters that "undisputed evidence" at trial showed that the ETF's were not intended to exceed losses, and that Sprint officials were "aware that their ETFs would recover only a fraction of the revenue lost as a result of early terminations." Sprint asserts that any charge that "does not overstate actual damages *cannot* be a penalty." Sprint cites testimony that early terminations occurred on average with 13.25 months left on a contract, depriving Sprint of average revenues of $49.16 per month in monthly recurring charges per customer and that it lost over $650 in revenue for each early termination. Sprint points out that the ETF's do not even cover their costs of adding new customers, which averaged $388 dollars during the class period. It contends that the evidence showed that it "well understood that due to competitive forces, the ETF could not be set anywhere near a level that would compensate it for a customer's breach through early termination."

Sprint's expert calculated that Sprint's actual damages from early termina-tions by the class members was $987 million.[22] Sprint contends that the ETF's on average *reduced* each class member's net obligation under their contract by more than $450, and that a subscriber with a $150 ETF would have reduced his or her net payments to Sprint by voluntarily paying the ETF with at least four months remaining on the contract, and a subscriber with a $200 ETF could have done the same by voluntarily paying an ETF with at least five months left. As we discuss further *post*, the jury found that Sprint's actual damages from early terminations were exactly equal to the amount of its uncollected ETF's ($225,697,433).

Sprint asserts that the trial court erroneously failed to consider the effect of Sprint's ETF's and in requiring a "formal study of estimated damages" to satisfy the motive-and-purpose prong of the reasonable endeavor test. Sprint argues that because the ETF's were not "intended to exceed loss substan-tially," they do not and cannot violate the motive-and-purpose aspect of the reasonable endeavor test. (*Hitz, supra*, 38 Cal.App.4th at p. 289.)

We note first that, as to Sprint's motive and purpose, whatever information as to costs and revenues Sprint may have been "aware" of, it cites to no evidence in the trial record that any of this information was part of the calculus in deciding to impose ETF's, or in determining the amount of an ETF. Further, we do not second-guess the trial court's factual determinations as to Sprint's motivation and purpose. (*Hitz, supra*, 38 Cal.App.4th at p. 290.)

While Sprint contends that it satisfied both prongs of the reasonable endeavor test in adopting ETF's, the real focus of its argument is on the *effect* of the ETF's. The thrust of that argument is that so long as the ETF amount is shown in practice to be *less than* Sprint's actual damages, the *effect* is not to generate a profit, whatever Sprint's motive and purpose, and nothing more is required to meet the test.

■ Sprint further contends that this court, in our discussion of section 1671, subdivision (d) in our prior unpublished decision in *In re Cellphone Termination Fee Cases, supra*, A115457, so held.[23] Sprint seeks to cull a holding from our prior decision which we did not make. In that decision we were required to consider whether the court abused its discretion in denying certification of a current subscriber class in this case on the basis of potential

---

[22] In contrast, Plaintiffs' expert, Dr. Selwyn, testified that Sprint's actual loss over the class period was $17,619,322.

[23] Both parties agree that our prior decision is law of the case. They each, however, perceive a different result.

intraclass conflicts.[24] While we reviewed the parties' respective positions on liquidated damages, we held that consideration of the merits of Plaintiffs' claims (that ETF's were invalid under § 1671, subd. (d)) was improper on a motion for class certification. We did not hold, as Sprint contends, that "Sprint's ETF's would 'satisfy[] the reasonable endeavor requirement . . .' if they approximated actual damages," nor did we hold that if early termination fees proved to be " 'reasonable estimates of Defendants' damages, [that] would 'mean[] they were not unlawful penalties.' " "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

Sprint likewise places undue reliance on our Supreme Court's decision in *Better Food Mkts. v. Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179 [253 P.2d 10] (*Better Food*), contending that *Better Food* imposes an entirely objective effect test. The plaintiff in *Better Food* was a grocery company that contracted with the defendant to install a burglar alarm system, then monitor that system, and notify the police if the alarm were triggered. It sued for damages when the defendant failed to do so and the store suffered a large loss. (*Id.* at p. 182.) The Supreme Court reversed a directed verdict for the defendant, but also held that any recovery for the plaintiff would be limited to $50, the amount set forth in the form contract's liquidated damages provision. (*Id.* at p. 188.) The court reiterated the rule that the amount of liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." (*Id.* at p. 187.) It also held that even though the liquidated damages provision was found in a form contract, and even though the defendant did not investigate the plaintiff's manner of doing business or the character and value of its stock, "the parties agreed to the liquidation provisions, and there is no evidence that they were not fully aware of circumstances making it desirable that liquidated damages be provided for." (*Ibid.*) The court in *Better Food*, however, dealt with a commercial contract and focused on the impracticability of fixing actual damages and the parties' agreement to the liquidated amount at the time of contracting. (*Id.* at p. 187.) It also did not articulate any rationale or underlying policy behind its rulings. (*Utility Consumers, supra,* 135 Cal.App.4th at p. 1038.)

The *Utility Consumers* case lends some support to Sprint's position. That court, in rejecting a claim that actual mutual negotiation was required to validate liquidated damages in a consumer contract (in that instance, late fees), made a detailed analysis of the cases underpinning and articulating the reasonable endeavor test. (*Utility Consumers, supra,* 135 Cal.App.4th at

---

[24] The trial court had found there was potential intraclass conflict " 'because many customers prefer multi-year plans with ETFs and would oppose the prosecution of this lawsuit.' "

pp. 1029–1039.) The court concluded that "the reasonable endeavor test looks primarily to the intent of the parties, as determined by the purposes behind a liquidated damages clause and the relationship between the amount of liquidated damages and a fair estimate of the actual damages from a breach of the contract. [Citations.]" (*Id.* at p. 1038.) The *Utility Consumers* court was critical of what it viewed as the interpretation of *Garrett, supra,* 9 Cal.3d 731 in *Hitz, supra,* 38 Cal.App.4th at page 289, "as focusing *solely* on the intent behind a liquidated damages provision, not on whether the amount selected was disproportionate to the loss from the breach." (*Utility Consumers,* at p. 1038, fn. 9, italics added.) The court observed that " 'the characteristic feature of a penalty is its lack of any proportionate relation to the damage which may actually stem from the breach of a contract [citations].' [Citation.]" (*Id.* at p. 1031, quoting *McCarthy v. Tally* (1956) 46 Cal.2d 577, 584, fn. 4 [297 P.2d 981].) In *Utility Consumers,* however, the plaintiff stipulated for purposes of the summary judgment motion that the defendant had performed an analysis to determine its actual late payment costs, and that, according to the analysis, those costs were greater than the late fee imposed, and conceded for purposes of the motion that the late fee charged was reasonable. (*Utility Consumers,* at p. 1026.) Further, the *Utility Consumers* court expressly did not reach the issue of whether the intent behind a liquidated damages provision could be fatal to a reasonable endeavor analysis, whether or not the amount of liquidated damages was disproportionate to the loss from the breach. (*Id.* at p. 1038, fn. 9.)

Here, as the trial court found, the evidence fails to establish any endeavor, reasonable or otherwise, to even approximate Sprint's actual damages flowing from breach of the term contracts by consumers, and instead reflects a marketing decision made with an entirely deterrent purpose and focus. We believe that Plaintiffs are correct that the reasonable endeavor test, to have any meaning, must necessarily focus on those circumstances actually considered in evaluating a liquidated damage provision, not post hoc rationalization.

In *Hitz,* the plaintiff class challenged late and overlimit fees on credit card balances. (*Hitz, supra,* 38 Cal.App.4th at pp. 277–278.) There was trial evidence that the defendant bank was looking for new sources of revenue, and the bank's witnesses admitted when the bank made the decision to impose the fees, it had conducted no study or analysis of the costs resulting from late and overlimit activity. (*Id.* at p. 289.) The bank nevertheless relied upon testimony from the responsible bank officer that he " 'had a good understanding of our costs from the information that I got on a regular basis,' and on his assertion that he never 'saw a situation' where [the bank] made a profit from late and overlimit fees." (*Id.* at p. 290.) The court observed that the "pivotal factor" was the bank's motivation and purpose, not whether an officer personally had a " 'good understanding' of costs." (*Ibid.*) In rejecting an argument similar to that Sprint makes here, the *Hitz* court found the bank's

reliance on cost studies from later years to be not pertinent to its motivation and purpose when it decided the amounts of its late and overlimit fees, and "irrelevant to the reasonable endeavor issue." (*Id.* at pp. 291–292.) This is "because the validity of liquidated damages 'is determined by circumstances existing when the fee provisions are inserted into the contract, and not by subsequent events . . . .' " (*Id.* at p. 291.) *Hitz* held that "The 'amount' of liquidated damages 'must represent *the result* of a reasonable endeavor' to estimate fair compensation. [Citation.] For the amounts of the challenged fees to have been such a *result*, the required reasonable endeavor logically must have preceded the setting of those amounts." (*Ibid.*, quoting *Garrett, supra*, 9 Cal.3d at p. 739.)

We see no necessary conflict between *Hitz* and *Utility Consumers*. We think that *Utility Consumers* correctly acknowledged that "whether a reasonable endeavor was made depends upon *both* (1) the motivation and purpose in imposing the charges, and (2) their effect." (*Utility Consumers, supra*, 135 Cal.App.4th at p. 1029, italics added.) Failure to meet its burden of proof on *either* element is fatal to Sprint's position.

Sprint again insists that the evidence shows that the ETF's benefit consumers by allowing Sprint to offer reduced monthly fees and subsidized handsets, as well as generally imposing charges less than, or at least equal to, Sprint's actual damages. Sprint contends that applying the reasonable endeavor test in these circumstances will expose consumers to liability for higher actual damages and would be inconsistent with the underlying rationale of the rule. But focusing solely on hindsight justifications would render the reasonable endeavor requirement meaningless if no effort at foresight were required, and arbitrarily selected charges could be routinely imposed in consumer contracts, subject only to the ability of a company to muster a credible defense if challenged in litigation. If no attempt to make a reasonable assessment of potential loss is required at the outset, and to make the amount of the liquidated damages consonant with that assessment, one of the important functions that liquidated damages serve, removing the uncertainty factor from determining damages from a breach of contract and reducing litigation, would be lost. (See *Utility Consumers, supra*, 135 Cal.App.4th at p. 1038.)

Sprint was required to show that it actually engaged in *some form of analysis* to determine what losses it would sustain from breach,[25] and that it

---

[25] Sprint complains that the trial court improperly required that it engage in a "formal study" in order to justify imposition of an ETF. It did not, and we also decline to specify as a matter of law what particular type of analysis is required to establish reasonable endeavor. We observe that Sprint was readily able to calculate its monthly recurring charges and lost revenues at the time of trial. Here, at least as is reflected in the trial record, there was an absence of *any* analysis at the time the decisions to impose ETF's were made.

made a genuine effort to estimate a fair average compensation for the losses to be sustained. Sprint may be correct that in retrospect its ETF's were reasonable in amount in light of its actual loss, and that they may actually have been beneficial in practice to at least some of its customers. However, institutional intuition is not a substitute for analytical evaluation, and retrospective rationalization does not excuse the objective assessment required at the inception of the contract.

## C. *Alternative Performance*

■    Sprint also sought to defend use of ETF's as "alternative performance," permitting subscribers to terminate contracts before the end of the agreement by paying a fee. "[T]o constitute a liquidated damage clause the conduct triggering the payment must in some manner breach the contract." (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1315 [27 Cal.Rptr.3d 797] (*Morris*).) A contractual provision that merely provides an option of alternative performance of an obligation does not impose damages and is not subject to section 1671 limitations. (See *Garrett, supra*, 9 Cal.3d at p. 735.)

In evaluating the legality of a provision, a court must first determine its true function and operation. (*Garrett, supra*, 9 Cal.3d at p. 735; *Morris, supra*, 128 Cal.App.4th at p. 1315.) "[W]hen it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages. [Citations.]" (*Garrett,* at p. 738.) To hold otherwise "would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds." (*Id.* at p. 737.)

As Plaintiffs note, Sprint itself, in several different versions of Sprint's form subscriber agreements referred to the ETF as a "liquidated damages" provision. The trial court "categorize[d] and analyze[d] the ETF by looking at its true nature, which the Court discern[ed] by looking at its objective effect on commerce generally and its effect on the majority of Sprint's customers specifically. [Citations.]" The court found that the ETF provisions "did not give customers a rational choice of paying the ETF or completing the contract," because the language of the ETF provision permitted Sprint to impose the fee on customers involuntarily. The court noted that "[o]f those customers who were charged an ETF, 80% were terminated by Sprint and experienced the ETF as the imposition of liquidated damages . . . ." As the

trial court stated, "If this case concerned a Sprint clause that stated customers could terminate term contracts early by paying a fee, then that fee might well be an alternative means of performance." Instead, "Sprint declared contracts breached, terminated service, and imposed ETFs as liquidated damages resulting from the asserted breaches."

Sprint argues that the trial court erred in judging the economic function of the ETF and choice it provided customers after the contract had either been performed or breached, and that it should instead have judged the choice the ETF provided customers at the outset of the contract. (*Blank v. Borden* (1974) 11 Cal.3d 963, 971 [115 Cal.Rptr. 31, 524 P.2d 127] [arrangement viewed from the time of making the contract].) But, as Plaintiffs respond, the service agreements provided from the inception of the contract that an ETF could be triggered involuntarily by Sprint, confirming that at the time of contracting the provision was not understood or intended as providing only for a "rational choice" of the customer.

Sprint cites a trial level decision of the United States district court in *Hutchison v. AT&T Internet Services, Inc.* (C.D.Cal., May 5, 2009, No. CV07-3674 SVW (JCx)) 2009 U.S.Dist. Lexis 53937 (*Hutchison*). There the trial judge granted summary judgment to an Internet service provider on a claim that its ETF violated section 1671. The court found that the fee there provided a realistic and rational choice of alternative performance to the subscriber. (2009 U.S.Dist. Lexis 53937 at pp. *12–*14.) While the federal trial court determination is not binding on this court in any event, it is self-evident that in contrast we deal here with contrary factual findings made after trial on a full evidentiary record.[26]

The court found that "Sprint has not met its burden of establishing that the predominant effect of the ETF provisions was to provide consumers with an alternate means of performing their contracts." Substantial evidence supports the findings.

D., E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[26] On April 8, 2010, Plaintiffs requested judicial notice of a declaration by an AT&T executive filed with a motion to dismiss in *Hutchison, supra*, 2009 U.S.Dist. Lexis 53937, and of an attached copy of the SBC terms of service at issue in that case. We deny the request as irrelevant since we find *Hutchison* unpersuasive and otherwise distinguishable.

[*] See footnote, *ante*, page 298.

## III. DISPOSITION

The judgment of the trial court is affirmed. The matter is remanded for retrial on the issue of Sprint's damages, and the calculation of any offset to which Sprint may be entitled. Neither party shall recover costs on this appeal.

Simons, Acting P. J., and Needham, J., concurred.A

A petition for a rehearing was denied March 24, 2011, and the petition of appellant Ramzy Ayyad and appellant Sprint Spectrum, L.P., for review by the Supreme Court was denied June 15, 2011, S192165. Baxter, J., and Werdegar, J., did not participate therein.